**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**


RHONDA COX,                              :

      Plaintiff,                       :        Case No. 3:08cv00422

 vs.                                    :        District Judge Walter Herbert Rice
                                                  Magistrate Judge Sharon L. Ovington
JAMES B. PEAK, M.D., Secretary,          :
U.S. Department of Veterans Affairs,
                                         :
      Defendant.                       :

                                         :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

      Plaintiff Rhonda Cox, a former employee of the United States Department of Veterans Affairs, brings this case pro se challenging, in part, the termination of her employment. Plaintiff's Complaint asserts four claims: (1) Failure to Accommodate, (2) Disability Discrimination, (3) Intentional Infliction of Emotional Distress, and (4) Retaliation.

      The case is before the Court upon Plaintiff's Complaint (Doc. #1), her Supplemental Supporting Documents and Letter (Doc. #s 10, 11), Defendant's Motion for Summary Judgment (Doc. #19), Plaintiff's Response in Opposition to Summary Judgment (Doc. #23), Defendant's Reply (Doc. #24), Plaintiff's Deposition (Doc. #21), and the record as a whole.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

II.     **Factual Background**

Plaintiff began her employment with the Department of Veterans Affairs in June of 1998 when she accepted a job at its facility in Dayton.  Her employment was terminated in February 2008.

A.      **Plaintiff's Complaint**

Plaintiff explains in her Complaint that on August 26, 1999, she "contracted hepatitis C while on the job working at the Dayton VA facility....  [She] has lived with this condition ever since....  Since contracting this condition, the VA has failed to accommodate [her] in the performance of her job and in part the failure to accommodate this condition eventually led to her termination in late February of 2008."  (Doc. #1 at ¶s 9-10).  Plaintiff's Complaint further alleges:

11.     In the latter part of her employment with the VA, Cox came under the supervision of Mark Frazee, her immediate supervisor.

12.     Since Mr. Frazee became Cox's supervisor, Cox was subjected to a hostile work environment which caused and contributed to numerous anxiety/panic attacks which were documented by Cox and her psychiatrist, Mark E. Reynolds, M.D.

13.     In addition to her Hepatitis C and her anxiety disorder, Cox also suffered from rheumatoid arthritis, fibromyalgia, major depression and sleep disorders, conditions which were worsened or exacerbated by the hostile work environment Cox was placed in at the VA.

14.     The VA also failed to accommodate Cox concerning these alleged disabilities and conditions.

15.     While Cox was employed at the VA under the supervision of Mr. Frazee, Cox noticed various violations of state and federal law and VA rules and regulations.  When Cox brought these to the attention of the Director of the VA, she was retaliated against eventually cumulating [probably, culminating] in her termination.

16.    ....

17.    Cox was terminated in February of 2008.....

(Doc. #1 at 2-3). Attached to Plaintiff's Complaint is, in part, a "SUMMARY OF OCCURRENCES RESPONSIVE TO 7/8/08 EEO REQUEST." (Doc. #1, Exhibit A). Plaintiff explains that this document is a summary of the allegations forming the basis of the conduct she describes in her Complaint. (Doc. #1 at ¶16).

Among the many documents Plaintiff has filed is information concerning the amount of her alleged monetary damages, which total $8,494, 510.00. (Doc. #10, Exhibit 18).

**B.    Factual Background**

Plaintiff earned an Associate Degree in medical assisting during 1996-97. (Doc. #21, Plaintiff's deposition at 28). She initially worked as an hospital lab technician for six months. In June 1998 she began her employment with the Department of Veterans Affairs at its facility in Dayton. *Id*. at 35.

After two or three days of work at the Dayton VA facility, she was sent to work mainly in the lab of a new VA clinic in Middletown, Ohio. (Doc. #21 at 36). As one of three technicians she drew blood, spun it, and drew off serum. She performed finger sticks for glucose levels and performed Coumadin level tests to test coagulation speeds. She also collected urine specimens. *Id*. at 36-37. Her clerical duties included checking the patients in, getting charts, checking vitals, putting patients in rooms, running the front desk, making appointments and checking patients out. *Id*. at 36.

Plaintiff testified that after working three or four months at the Middletown VA, she was transferred back to the Dayton VA facility. (Doc. #21 at 37). She explained, "they ... said I wasn't qualified for the Middletown VA. But I argued with them that I was, but it didn't do any good...." *Id*. Plaintiff further explained that during her first year of employment with the VA she was a GS-4 but the position in the Middletown Clinic

required a GS-5 level employee.[2]  *Id*. at 40.  The medical assistant who took Plaintiff's place at Middletown Clinic was a GS-5.  *Id*. at 40-41.

Plaintiff continued to work at the Dayton VA facility for about two years.  (Doc. #21 at 41).  During that time, she experience many accidental needle sticks, and she contracted Hepatitis C.  *Id*. at 41-42.  She attributes this to being on second shift where she was harassed by her supervisor, who was a black woman.  *Id*. at 42-43.  Plaintiff filed a "reverse discrimination" charge alleging she was harassed on second shift.  She alleges that an investigation was conducted but the investigator failed to contact any of her witnesses.  Plaintiff acknowledged that the decision regarding her EEO charges was not favorable to her.  *Id*. at 43-48.

Plaintiff stated that during the late 1990s to early 2000, she was written up for being absent without leave fifty to seventy times as part of the harassment by her supervisors.  She emphasized that with one exception she "was harassed by every supervisor she had up there."  (Doc. #21 at 48).  She testified that her supervisors were intimidating her, screaming at her, talking in loud overtones to her, and were lying about her.  *Id*. at 49.  Plaintiff further testified:

> Every performance evaluation I had my supervisors always had something good to say about me: I was patient with the patients, I was a patient advocate, this, that and the other, but they harassed me.

(Doc. #21 at 50).

After working in the Dayton VA facility for two years, Plaintiff applied for and was granted a transfer back the Middletown VA clinic.  (Doc. #21, at 53).  She worked there over the next four years.  She testified, "But then it was such a hostile work environment that Dr. Mark Reynolds wrote a statement that one of us needed to go because it was a hostile work environment."  *Id*.  Dr. Reynolds had been Plaintiff's

---

[2]  Information about U.S. Government's GS or General Schedule pay table can be found on the U.S. Office of Personnel Management's website, http://www.opm.gov.

4

treating psychiatrist since 2000. Plaintiff testified that Dr. Reynold's letter meant either Plaintiff or her supervisor Carol Vokerding needed to be transferred out of the Middletown Clinic. *Id*. at 53-54. Dr. Reynolds wrote this letter in October 2004. *Id*. at 55. One week later, Plaintiff was transferred to the Primary Care Department – or "Prime Care" – at the Dayton VA facility. *Id*. at 55-56.

At some point Carol Vokerding was also transferred to the Prime Care, but she did not become Plaintiff's supervisor. *Id*. at 54. Plaintiff explains, "So I went to my supervisor and I showed her the letter from Dr. Reynolds, and I said I am not supposed to be working around this woman, you know, she makes me sick to my stomach to look at her, all the stuff she did to me. But they said, well, she's not your supervisor, so don't worry about it, you know...." *Id*. According to Plaintiff, certain people at Prime Care – Dr. DeGuzman and Joe Ricketts (a physicians assistant) – screamed at her. And some of the new nurses hollered at her, she notes, because "they [were] RNs so I guess they thought they [were] more important than..." Plaintiff. *Id*. at 54-55.

Plaintiff worked the first shift during her employment in Prime Care. (Doc. #21 at 77-78). Her job duties included escorting patients to exam rooms, checking blood glucose, taking blood pressure reading while the patient was laying, sitting and standing. *Id*. at 87. She also entered medical notes on electronic patient records.

Plaintiff testified that Joe Ricketts "jumped on me over typing my notes in caps, in all caps. So he took the caps lock off the computer in these rooms. That's what he did. But he had to put them back, you know, because he wasn't really supposed to be doing that." (Doc. #21 at 88). Plaintiff did not know why she was typing in all caps. *Id*.

Plaintiff also described her experiences at Prime Care as follows:

> What happened there was the supervisors [were] screaming at me on
> jobs, doctors screaming at me. I filed another EEO complaint in 2006 on
> the people in prime care, the way they treated me. The doctor was yelling at
> me all the way down the hall in front of the patient, you know. It was very
> unprofessional screaming at me in front of patients.

(Doc. #21 at 78).  Plaintiff stated that her 2006 EEO complaint alleged harassment on the basis of disability.  An EEO Investigator took her statement by telephone but "tricked" her into dropping all of the charges.  *Id*. at 80-81.  She testified that the Investigator told her to sign a paper that would drop only one of charges.  After she signed it, all her charges were dropped.  *Id*. at 81-82.  She consequently discussed her situation with Human Resources Director, Dr. Steven Cohen.  She testified:

> I went and talked to Steven Cohen myself and told him I couldn't work with the people at prime care because they were too hostile and too intimidating and, you know, they just made me feel like I was nothing, you know?  And that's not a very good feeling.  You know, I went to school to get an Associate degree, and when you get an Associate degree you go to work somewhere.  You don't expect to be screamed at the whole time you are at work, you know, and harassed.  I just don't feel it was right.  I feel the VA was trying to get me to quit or try to get me to have a nervous breakdown....  I had several panic attacks on the job, too.

*Id*. at 82.  When she spoke with Dr. Cohen, she was crying and upset and wanted a transfer.  She believes that Dr. Cohen was aware of Dr. Reynold's letters and work-restriction recommendations.  *Id*. at 91-92.  Dr. Cohen told Plaintiff that he had the perfect job for her, and in July 2006, he transferred her to Voluntary Services at the Dayton VA facility.  *Id*. at 55-56, 92, 94.

During her first year with Voluntary Services, Plaintiff's supervisor was Sharon Croteau, who was the only supervisor Plaintiff had no trouble with during her VA employment.  (Doc. #21 at 49-50, 90, 94).  Croteau assessed Plaintiff's job performance as "excellent."  *Id*. at 94.  Croteau left the Dayton VA facility in June of 2007.  *Id*. at 97-99.  At that point Mark Frazee became Plaintiff's supervisor and her work environment deteriorated and her employment with the Department of Veterans Affairs was eventually terminated.

After supervising Plaintiff for only one month, Frazee rated her job performance as needing improvement.  *Id*. at 94.  Plaintiff thinks that Frazee was not supposed to evaluate

her job performance until he had supervised her for sixty or seventy days. *Id*. at 94-95.

On July 17, 2007, Frazee wrote a letter "to confirm a conversation" he had with Plaintiff about her "Position Description, Timeliness, Sleeping on Duty and Job Duties." (Doc. #19, attached). Frazee wrote that Plaintiff had been late arriving for work and returning from lunch "numerous times in the last several weeks." *Id*. He also wrote, "I verbally warned you once about sleeping on duty. It has been reported to me by staff members and volunteers that they have seen you sleeping while on duty. This needs to be stopped. If you are found sleeping on duty again you will receive formal disciplinary action." *Id*.

Frazee's July 17, 2007 letter also contains an acknowledgment paragraph, which Plaintiff appears to have signed. The paragraph states:

> I have received a copy of this letter and one attachment and have taken part in this conversation. I understand this is a verbal warning and will be maintained as part of my permanent record only if I do not comply with what was discussed. If I comply this will be removed from my file in 1 year. I was given the opportunity to have a union rep present.

*Id*. Beneath this paragraph Plaintiff wrote the following: "If I leave Voluntary Service before 12 months this will be removed from my record (per Rhonda request)." *Id*. Apparently later, she added, "Wrote this after I signed." *Id*. And, "I asked for a Union rep. never got one." *Id*.; *see* Doc. #10, Section 10-6.

On October 26, 2007, Frazee wrote a Memo to Plaintiff listing many instances when, according to Frazee, Plaintiff had been late for work or late returning from lunch. (Doc. #19, attached). Frazee further wrote, "Your tardiness has a direct impact on your performance of your duties as another employee must assist in your duties. Therefore, this is to inform you that effective immediately, I will not excuse further instances of tardiness.... You will be charged absent without leave (AWOL) if you fail to report to duty on time. Further instances of misconduct will not be tolerated and may lead to disciplinary/adverse action being taken against you...." *Id*.

Plaintiff has filed in this case a copy of Frazee's Memo with her (presumably) handwritten additions. (Doc. #10, Section 10-6). Plaintiff wrote that Frazee asked her to sign the document but she declined. She noted, "I told him I wanted a union rep when I went into his office but he kept talking." *Id*. She also wrote various notes challenging the truth or accuracy of several entities and explaining that certain other entries were dates when she apparently went "line dancing" at lunch. *Id*.

On December 28, 2007, Frazee wrote a Memorandum recommending the removal of Plaintiff from her position in Voluntary Services "to promote the efficiency of the service." (Doc. #19, attached). Frazee listed and described the following reasons for recommending Plaintiff's removal: (1) allowing an unauthorized user to use her work (VA) computer constituting inappropriate conduct; (2) deliberate failure to carry out a supervisor's instructions by bringing her grandson to work; (3) inappropriate behavior by sleeping at her desk; and (4) inappropriate conduct with patients when she invited a patient and her husband to her house where she played cards and drank beer with the patient. *Id*.

Plaintiff testified that Frazee failed to use progressive discipline as he was required to do before terminating her employment. (Doc. #21 at 136-37). Plaintiff also testified that Frazee made up "nonsense" and "lies" as reasons for her termination. *Id*. at 137. She explained, "He told me he saw me in my office asleep with my feet propped up on my desk, and the IT worker would say the same thing, and said I had my grandson in my office with me do you think I could sleep with a six year, with a six year old? I don't think so." *Id*.

In or near June 2007 Plaintiff began experiencing drowsiness as a side effect of medications. She began seeing a sleep physician, Dr. George Burton, who prescribed Ritalin to counteract other medication that was causing her drowsiness. (Doc. #21 at 138-39). Plaintiff testified that by July 2007 the Ritalin was working, and she was no longer fell asleep at work. *Id*. at 139.

Plaintiff maintained that a small clique – consisting of Tom Bush (the IT worker), Frazee, and Ms. Crawford – "would do what they wanted...." (Doc. #21 at 139). She alleged that Frazee, Crawford, and Bush took donated items for their own personal use. *Id*. She also testified that she was fired for telling the Director, Guy Richardson, that they were purchasing personal use items with the VA credit card. Specifically, she alleges that Frazee and Crawford bought cell phones with the VA credit card for personal use, and Frazee bought a big screen television for his office. *Id*. at 140. Plaintiff told Richardson about the alleged credit card abuse during a meeting on January 25, 2008. *Id*. at 143, 149. The meeting had been called as a result of a termination letter Frazee had given Plaintiff on January 4, 2008. *Id*. at 149. During the meeting, Plaintiff acknowledged that she did not see itemized bills for the credit cards and that her job duties did not involve paying bills. *Id*. at 155-56.

With respect to her bringing her grandchild to work, Plaintiff indicated that it only happened twice, only for half a day each time, because the day care center was closed. This only occurred on Thanksgiving morning and on the morning of the day after. Her grandson was about five years old at the time. The only other person who she believes brought their children to work was Dr. Bashire. This occurred when Plaintiff worked at the Middletown VA clinic. *Id*. at 159-61.

On or about February 18, 2008, Director Richardson wrote a Mem to Plaintiff, placing her on administrative leave "through Friday, February 22, 2008, the effective date of [her] removal from Federal Service." (Doc. #10, Section 17, Memorandum attached).

## III. Discussion

### A. Introduction

Defendant contends that it is entitled to summary judgment in its favor on each claim raised in Plaintiff's Complaint. Plaintiff contends that her case should not be dismissed and that Defendant should bear all costs.

Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Jones v. Potter*, 488 F.3d 397, 402-03 (6th Cir. 2007).

### B.      Disability Discrimination

Plaintiff claims in her Complaint that Defendant violated her rights under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§794, et seq., by terminating her employment because of her actual or perceived disability.

The Rehabilitation Act provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a); *see Jones*, 488 F.3d at 403.

Plaintiff has not submitted affirmative evidence of direct disability discrimination in support of her claims under the Rehabilitation Act. *See* Doc. #s 10, 23. Her disability discrimination claims are therefore analyzed under the three-stage *McDonnell Douglas/Burdine*[3] framework. *See Jones*, 488 F.3d at 403-04. Plaintiff must first present evidence sufficient to support a prima facie case of disability discrimination. *Id.* at 404. If she succeeds, Defendant must articulate a legitimate non-discriminatory reason the employment decision Plaintiff challenges. *Id.* If Defendant is that articulate, the burden

_____

[3] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

10

falls on Plaintiff to present sufficient evidence to create a genuine issue of fact that Defendant's articulated reasons are a "pretext designed to mask illegal discrimination." *Id*.

A prima facie case of disability discrimination consists of five elements: (1) the plaintiff is disabled, (2) she was otherwise qualified for the job, with or without reasonable accommodation, (3) she suffered an adverse employment action, (4) the employer knew or had reason to know of her disabilities, and (5) after the adverse employment action, either she was replaced by a nondisabled person or her position remained open. *See Jones*, 488 F.3d at 404 (and cases cited therein).

Plaintiff asserts that her disabilities include an anxiety disorder, which causes anxiety/panic attacks, Hepatitis C, rheumatoid arthritis, fibromyalgia, major depression, a sleep disorder, thyroid problems, and osteopenia. (Doc. #1 at ¶s 12-14; Doc. #21 at 198-201). In a conclusory and perfunctory manner, Defendant asserts that Plaintiff does not meet the statutory definition of "disabled." (Doc. #19 at 12). Rather than developing this argument further, Defendant turns immediately to its articulation of non-discriminatory reasons for terminating Plaintiff's employment. *See* Doc. #19 at 12-14. The parties' dispute in the current record, therefore, focuses on the second and third stages of the *McDonnel/Douglas* framework.[4] *Cf. Langley v. DaimlerChrysler Corporation*, 502 F.3d 475, 483 (6th Cir. 2007)(issue waived if not addressed or "'adverted to ... in a perfunctory manner, unaccompanied by some effort at developed argument.'" (quoting *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000)).

Defendant asserts that it terminated Plaintiff's employment in Voluntary Services – not due to any disability – "but for a continued failure to maintain the standards of her position." (Doc. #19 at 13). Defendant points to the reasons stated in Frazee's July 2007

---

[4] Defendant has effectively waived its possible challenge to Plaintiff's disability status only for purposes of its present motion for summary judgment. In the event the case proceeds, Defendant should be permitted to challenge, if warranted, Plaintiff's disability status.

letter, in his September 2007 Memorandum, and her fifty to seventy-five incidents of being absent without leave. *Id*. at 13-14. Because these reasons concern Plaintiff's job performance, not her disability, Defendant has articulated legitimate, non-discriminatory reasons for terminating Plaintiff's employment.

Defendant's successful articulation triggers Plaintiff's burden to create a genuine issue of material fact regarding pretext. She will accomplish this by presenting affirmative evidence sufficient for a jury to reasonably infer "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge.'" *Jones*, 488 F.3d at 406 (quoting *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994)) (emphasis omitted).

Beginning with first and third possible methods of showing pretext, they are typically considered together "because they are both 'direct attacks on the credibility of the employer's proffered motivation for firing [the employee] and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Jones*, 488 F.3d at 406 (quoting *Manzer*, 29 F.3d at 1084) (other citation omitted). Doing so reveals that Plaintiff has not met her burden of showing the existence of a genuine issue of material fact concerning the credibility of Defendant's asserted reasons for her termination. Although she testified during her deposition, that Frazee lied and fabricated his reasons for wanting her removed from her position, Plaintiff must do more; she must show that the VA lacked an "honest belief" in the reasons it has articulated for her termination. *See Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001). "Under this [honest belief] rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski*, 274 F.3d at 1117. Indeed, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to

summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chemical Co*., 580 F.3d 394, 401 (6th Cir. 2009)(citation omitted).

> The rationale behind the rule is that the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent. 'In other words, arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are 'right but whether the employer's description of its reasons is honest.'

*Smith v. Chrysler Corp*., 155 F.3d 799, 806 (6th Cir. 1998).

Plaintiff has not presented affirmative evidence sufficient to create a genuine issue over whether Defendant lacked an honest belief in its reasons for terminating her employment. If her allegations are accepted as true, the most she can show is that Frazee intentionally falsified information about some of her work-performance problems – such as her tardiness or bringing her grandson to work. Yet, at least some evidence, including Plaintiff's testimony, reveals that not all of the performance problems Frazee identified were untrue. For example, construing in Plaintiff's favor what appear to be her handwriting on Frazee's October 2007 Memo, the handwriting indicates that she was, in fact, late on some dates, including many days when she was late returning from line dancing at lunch. Plaintiff, moreover, acknowledged during her deposition that she brought her grandson to work on two occasions. (Doc. #21, 161-62). Plaintiff alleges that a physician, Dr. Bashire, at the Middletown VA would bring his son to work without negative repercussions. Yet Frazee was not a supervisor at Middletown VA, and therefore, no reasonable inference could be drawn to connect him to the more favorable treatment of Dr. Bashire. Consequently, no reasonable inference of discrimination arises from Frazee's criticism of Plaintiff for bringing her grandson to work.

More significantly, Plaintiff has not alleged the existence of circumstances

showing that Director Richardson – the ultimate decisionmaker concerning her termination – lacked a reasonable and honest belief in the job-performance-based reasons for her termination.  Viewing the evidence in Plaintiff's favor, Director Richardson was faced with conflicting versions of purported workplace misconduct by Plaintiff:  Frazee's version versus Plaintiff's version.  Upon receiving Frazee's December 28, 2007 removal recommendation, Director Richardson did not blindly or automatically accept it.  Instead, he allowed some time to go by – about one month – before meeting with Plaintiff and her union representative, thus giving her fair notice and opportunity to refute Frazee's removal recommendation.  Rather than containing some probative evidence casting doubt on the honesty of Director Richardson's belief in Frazee's reasons for recommending Plaintiff's removal, the record instead shows that Director Richardson reasonably relied on the particularized facts about Plaintiff's job-performance problems provided by Frazee in his written documentation from July 2007 to his final removal recommendation on December 28, 2007.  Thus, even if Frazee's reasons were "'mistaken, foolish, trivial, or baseless,'" *Chen*, 580 F.3d at 401, the lack of a genuine issue about Defendant Richardson's honest belief defeats Plaintiff's effort to show pretext under the first and third methods.  *See Burks v. Yellow Transp., Inc.*, 258 Fed.Appx. 867, 875 (6th Cir. 2008)("Burks 'has offered no evidence to indicate that [Yellow Transportation] made its decision on grounds other than those offered.'")(citation omitted).  She must, therefore, turn to the second method of showing pretext.

Under the second method of showing pretext, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal."  *Manzer,* 29 F.3d at 1084 (emphasis in original).  "Nevertheless, the plaintiff attempts to indict the credibility of [the] employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant.  In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely

than not' that the employer's explanation is a pretext, or coverup." *Russell v. University of Toledo,* 537 F.3d 596, 606-07 (6th Cir. 2008) (quoting in part *Manzer,* 29 F.3d at 1084).

Viewing the evidence in Plaintiff's favor, the record at most shows the existence of a conflict between Plaintiff and Frazee over the validity of his reasons for recommending Plaintiff's removal. Under the second method of showing pretext, however, Plaintiff must concede the accuracy and validity of Frazee's reasons. *See Manzer,* 29 F.3d at 1084. Considering that concession together with all the evidence of record, no jury could reasonably conclude – based on the sheer weight of the circumstantial evidence – that Defendant Richardson held a discriminatory motive for terminating her employment. *See Russell,* 537 F.3d at 606-07; *cf. Jones,* 488 F.3d 409 - 10 ("the Rehabilitation Act..., unlike Title VII, requires Jones to prove that he was fired '*solely* by reason of ... his disability.'" (citation omitted)).

Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of disability discrimination.

### C. Reasonable Accommodation

Plaintiff maintains that she "was able to perform the essential functions of her job with or without a reasonable accommodation." (Doc. #1 at ¶23). She asserts that Defendant violated her rights under the Rehabilitation Act by failing to provide her with a reasonable accommodation of her disability and by refusing to engage in any dialog with her concerning possible accommodations. She explains:

> I had contacted Hepatitis C through several dirty needle sticks. Hepatitis C is a lifelong disease. The VA failed to accommodate me with my C.O.P. [Continuation of Pay] for my Hepatitis C. I was so devastated that I really needed time off work. The only thing they gave me was one week off and I had to use my leave. I feel because time off was not given to me and the harassment I had to deal with on the second shift ... is why I had so many needlesticks. After 2 letters from Dr. Reynolds, a hardship letter that I had written, a letter from the Occupational Health Physician, and the union requested me time off and moved to first shift. I practically had to

15

beg to get moved back to first shift and it took years for the agency to do so.

> On Page 11 of Mr. Quinn's [Defendant's] motion for summary judgment, he had written it was clear that I never requested reasonable accommodations that [were] not granted.  That was untrue.  I did not get my C.O.P. for my Hepatitis C, nor my advanced sick leave I requested, [n]or a chance to talk to the Director about my treatment from Mr. Frazee....

(Doc. #21 at 8-9).  Plaintiff also argues, "I feel the VA failed to accommodate me with anything.  I had filed 2 separate E.E.O. complaints that [were] not resolved properly...." (Doc. #21 at 9).

To survive summary judgment on her reasonable-accommodation claim, Plaintiff "must provide an explanation sufficient to warrant a reasonable juror finding that, despite her statement that she is unable to work,[5] that she could nonetheless perform the essential functions of her job, with or without reasonable accommodation."  *Justice v. Pike County Bd. of Educ.*, 348 F.3d 554, 564 (6th Cir. 2003)(footnote added).  Plaintiff bears "the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable."  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996)(emphasis in original); *see Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th 2001).  "The employer then has the burden of persuasion on whether the proposed accommodation would impose an undue hardship."  *Groner*, 250 F.3d at 1044.

Plaintiff has not met her initial burden of presenting affirmative evidence tending to show that she proposed an objectively reasonable accommodation or that Defendant denied her an objectively reasonable accommodation.  During her deposition, Plaintiff testified, "I could perform the essential functions i[f] my supervisors would leave me alone, you know, and my coworkers would stop bothering me and harassing me, intimidating me, making me feel like I'm this high (indicating)...."  (Doc. #21, 217).  She

---

[5] Plaintiff's arguments concerning her inability to work concern her required absence after contracting Hepatitis C, the denial of her advance request for additional absence, and denial of her request for COP relate to her inability to work during those times.

was next asked, "so the accommodation you needed was space, distance, or something from you supervisors, not a different keyboard or a different chair or different hours of work?" *Id*. Plaintiff responded with testimony about her injuries from several years earlier and previous unrelated work assignments. She stated that she wanted a "different shift at work, and I didn't get my 45 days off with pay for my hepatitis, which I think I deserved it. And then the union people asked my supervisor for two weeks off, and she wouldn't give me two weeks off. So I got one week for my hepatitis." *Id*. at 217-18.

Although Plaintiff also points to the fact that Defendant only gave her one week off after she contracted Hepatitis C – which occurred in or near late 1998 – the evidence of the circumstances existing at that time does not give rise to a reasonable inference that providing one-week leave was not an objectively reasonable accommodation. She, moreover, has not presented any medical evidence tending to show that she needed a forty-five day leave of absence in order to be able to perform the essential functions of her job. And, the fact that she returned to work after her one-week absence tends to show that she was able to perform her job duties without a longer leave of absence.

Other events tend to show that Defendant attempted to retain Plaintiff in a job that fit her work skills and her health difficulties. She acknowledged, for example, that when her psychiatrist (Dr. Reynolds) recommended she be moved to first shift, Defendant switched her to a first-shift job. She also testified that when she requested a change in work hours early in her employment with Voluntary Services, her supervisor (Sharon Croteau) changed her work hours from starting at 8:00 to starting at 8:30. This apparently helped Plaintiff because after Frazee became her supervisor, she wrote a memo to him stating, "I am very happy with my schedule at this time." (Doc. #19, Memo attached). And during Plaintiff's deposition, she confirmed that she did not ask Frazee to change her work schedule. (Doc. #21 at 218).

In addition, on a previous occasion, Defendant transferred Plaintiff to work at Prime Care to remove her from the hostile work environment she allegedly experienced in

the Middletown lab.  Then, after further harassment occurred at Prime Care, including alleged harassment by physicians and/or co-workers, she discussed it with Dr. Cohen.  In response, Dr. Cohen told Plaintiff that he had the perfect job for her, and in July 2006 he transferred her to Voluntary Services at the Dayton VA facility, where Plaintiff worked with her favorite supervisor, Sharon Croteau.  *Id*. at 55-56, 92, 94, 226.

For the above reasons, the record does not contain a genuine dispute over the fact that Defendant attempted to accommodate Plaintiff's physical and mental health difficulties in several different ways on several occasions.  The record, moreover, does not contain evidence tending to show that Plaintiff requested, and was denied, an objectively reasonable accommodation.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's reasonable accommodation claim.

### D.    Intentional Infliction of Emotional Distress

In support of her claim of intentional infliction of emotional distress, Plaintiff states, in part, "conduct in disciplining and ultimately terminating her was extreme, outrageous, wilful, wanton, and utterly intolerable in a civilized community....  The treatment [Plaintiff] received from the VA in disciplining and ultimately terminating her employment did, in fact, exacerbate [her] medical conditions...," causing her "severe emotional and psychological distress, embarrassment and humiliation."  (Doc. #1 at 4).  These allegations, however, run into an insurmountable hurdle in the form of the Federal Torts Claims Act.

Sovereign immunity shields the United Government and its agencies from civil suits unless it consents to be sued.  *See FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *see also United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *Reed v. Reno*, 146 F.3d 392, 398 (6th Cir. 1998).  "The Federal Tort Claims Act provides a limited waiver of the national government's immunity

from suit for torts committed by federal employees and places several conditions on the waiver. The Act, first of all, requires claimants to give government agencies an initial opportunity to resolve claims: 'An action shall not be instituted upon a claim ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing.' 28 U.S.C. § 2675(a)." *Ellison v. United States*, 531 F.3d 359, 361 (6th Cir. 2008)

"[T]he Act also tells claimants when they must file their claims: 'A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues *or* unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented'" *Ellison*, 531 F.3d at 361 (quoting in part 28 U.S.C. § 2401(b) (emphasis added)).

Plaintiff acknowledged during her deposition that she did not send either a letter or the Standard Form (SF-95) to the Department of Veterans Affairs concerning her allegations and claim of intentional infliction of emotional distress. (Doc. #21 at 227-28). "Claimants .. *must* present their claims to the relevant agency before bringing suit in federal court. *Ellison*, 531 F.3d at 361-62 (emphasis in original)(citing 28 U.S.C. § 2675(a)). Because there is no genuine dispute over the fact that Plaintiff did not present Defendant with her written allegations or claim of intentional infliction of emotional distress, this Court lacks subject matter jurisdiction over this claim under the Federal Tort Claims Act. *See* 28 U.S.C. §2675(a); *see also Singleton v. United States*, 277 F.3d 864, 872-73 (6th Cir. 2002).

Accordingly, Defendant is entitled to summary judgment on Claim III in Plaintiff's Complaint.

**E.    Retaliation**

Plaintiff alleges in her Complaint, "The VA's conduct constitutes unlawful

retaliation against [Plaintiff] for reporting to the Director of the VA violations of state and federal law and the VA's rules and regulations.... The actions of the VA constitute unlawful retaliation in violation of Ohio Revised Code § 4112.02(I) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)." (Doc. #1 at 5).[6]

Defendant contends that summary judgment is warranted in its favor on Plaintiff's retaliation claim because she has not set forth a prima facie case of retaliation and because Defendant had a legitimate business purpose for terminating her employment.

Plaintiff's Memorandum in Opposition does not directly refer to her retaliation claim and contains little, if any, information concerning this claim. Accepting Plaintiff's deposition testimony as true and construing her arguments in her favor does not reveal the presence of a triable retaliation issue.

The *McDonnell Douglas/Burdine* framework applies to Plaintiff's retaliation claim. *See Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007); *see also supra*, n. 3. To establish a prima facie case of retaliation Plaintiff must show (1) she engaged in activity protected by Title VII; (2) her exercise of protected rights was known to the Defendant; (3) Defendant thereafter took a materially adverse employment action against her or was subjected to severe and pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between Plaintiff's protected activity and the adverse employment action taken by Defendant. *See Dixon*, 481 F.3d at 333; *see also Garner v. Cuyahoga County Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009); *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000).

The first and second requirement are easily met. Plaintiff engaged in protected activity when she filed an EEO charges in 2000 and 2006. Construing Plaintiff's

---

[6] Plaintiff's Complaint does not assert that Defendant violated the False Claims Act, 31 U.S.C. §3729(a)(1); her Complaint contains no indication that she seeks to raise a qui tam claim based on purported violations of the FCA; and her Complaint contains no indication that she has satisfied the jurisdictional prerequisites for raising a qui tam claim. *See U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 506-07 (6th Cir. 2009).

deposition testimony in her favor, Defendant knew about her EEO charges. *See* Doc. #21 at 45-46, 78-80.

As to the third element, Defendant's act of terminating Plaintiff's employment constituted a materially adverse employment action taken by Defendant. Additionally, it might well be that Plaintiff's allegations, if accepted as true and liberally construed in her favor, would be sufficient to create a prima facie case of retaliatory harassment by Frazee. Yet it is unnecessary to reach this conclusion because assuming Plaintiff has established this element of her prima facie case, the evidence does not create a genuine dispute over the final causation element of Plaintiff's prima facie case.

The decision to terminate Plaintiff's employment occurred at some point after Frazee prepared his written removal recommendations (late December 2007) and her termination in February 2008. Consequently, more than a year, possibly as much as two years, had passed from the date Plaintiff engaged in her protected activity of filing her second EEO charge in 2006. "[W]here the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004). The two pertinent events – Plaintiff's protected activity and her termination – did not occur "acutely near in time" and therefore do not create a reasonable inference of causation. *See id*. (and cases cited therein).

The evidence also fails to show a causal connection between Plaintiff's EEO charge and Frazee's harassment of her. At the time Plaintiff filed her second EEO charge in 2006, Plaintiff was working in Prime Care and Frazee had not yet become her supervisor. After the proceedings concerning her EEO charge concluded, Dr. Cohen transferred Plaintiff to Voluntary Services at the Dayton VA facility (in July 2006). (Doc. #21 at 55-56, 92, 94). During the next year, Plaintiff's supervisor was Sharon Croteau, who was the only supervisor Plaintiff had no trouble with during her VA employment. (Doc. #21 at 49-50, 90, 94). There was consequently a significant period of Plaintiff's

employment after she filed her second EEO charge where she enjoyed working for her supervisor and no adverse employment action occurred. The post-EEO charge harassment began only after Croteau left the Dayton VA facility in June of 2007. At that point, Frazee became Plaintiff's supervisor. But the fact that Frazee did not become her supervisor until well after she filed her second EEO charge tends to show little, if any, connection between her protected activity and Frazee's harassment. Plaintiff's deposition testimony, moreover, tends to show that she believes Frazee's conduct was personality driven. She testified: "He just didn't like me. He just – I don't know what his problem was, you know...." (Doc. #21 at 236). In sum, the record does not contain affirmative evidence upon which a jury could reasonably infer the existence of a causal connection between Plaintiff's filing of an EEO charge in 2006 and Frazee's alleged harassment of her.

As to Plaintiff's report to Director Richardson about Frazee's credit-card misuse, she did not report this until the meeting on January 25, 2008. (Doc. #21 at 143, 148-49). She had not reported the credit-card misuse to Director Richardson before that date. *Id*. at 149. Assuming her report constituted a protected activity, it did not occur until after she was placed on leave, during the time she was given to respond to Frazee's removal recommendation. Consequently, her report played no causal role in the prior-occurring alleged harassment, which must have occurred from the time Frazee became her supervisor in July 2007 through late December 2007 when Frazee recommended her removal. Similarly, because Plaintiff's first report of Frazee's misconduct to Director Richardson did not occur until January 25, 2008, her report could not have caused Frazee's prior recommendation (again, in late December 2007) to remove Plaintiff from her job with Voluntary Services.

Lastly, as discussed above, *supra* §III(B), Defendant's decision to terminate Plaintiff's employment was based on legitimate non-discriminatory reasons concerning her job performance and the record does not contain evidence tending to show

Defendant's reasons were pretextual. For the same reasons, *see id*., Defendant's reasons for terminating Plaintiff's employment constituted a non-retaliatory, non-pretextual basis for terminating her employment.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendant's Motion for Summary Judgment (Doc. #19) be GRANTED; and

2. The case be terminated on the docket of this Court.

April 16, 2010

s/Sharon L. Ovington
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).